IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **KELLER NORTH AMERICA, INC.,** | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Case No. |
| | ) |
| **MICHAEL W. TERRY,** | ) |
| | ) |
| Serve: | ) |
| 615 Trotter Way | ) |
| Canton, Georgia 60115 | ) |
| | ) |
|     Defendant. | ) |

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff Keller North America, Inc. ("Keller"), by and through counsel, for its Verified Complaint for Injunctive Relief and Damages against Defendant Michael W. Terry ("Terry"), states and alleges as follows:

**NATURE OF THIS ACTION**

1. Keller is a geotechnical specialist contractor that works with its clients to address their geotechnical challenges across the United States and worldwide. To that end, Keller maintains a team of highly trained engineers, project managers, and business developers who have a wealth of experience and provide a wide range of geotechnical techniques and optimum solutions to clients.

2. Terry was formerly employed by Keller and worked for the company for over thirty years, holding integral leadership positions with the company, including most recently as Senior Vice President, and overseeing Keller's operations in the Southeast United States.

3. As a result of his high-level role with Keller, Terry had access to Keller's confidential and proprietary information relating to Keller's business plans, strategies, operations, productivity, customers, and financial performance and projections, and he was positioned to divert other members of Keller's workforce, along with Keller's intellectual property and business relationships, away from the company.

4. Terry's employment with Keller was terminated on or about July 1, 2023. In connection with the end of his employment, Terry entered into a contract with Keller that included confidentiality, non-competition, customer non-solicitation, and employee non-solicitation provisions.

5. Despite his post-employment contractual obligations to Keller, Terry went to work for Keller's direct competitor, Berkel & Company Contractors, Inc. ("Berkel"), in the same market area doing the same or substantially similar job for Berkel as he did for Keller.

6. Keller recently learned that not only is Terry working for a competing company, but he has also spearheaded an effort to solicit current Keller employees across the country – including the bulk of his business unit and co-workers in Keller's Southeast Region – in an attempt to persuade Keller's employees to leave their employment with Keller to work for Berkel or otherwise interfere with Keller's economic relations with the employees.

7. Terry has been successful in this endeavor, with at least six Keller employees from Terry's business unit at Keller defecting to Berkel.

8. Consequently, Keller brings this action for breach of contract and to enjoin Terry's continued unlawful activity.

## PARTIES, JURISDICTION, AND VENUE

9. Keller is a corporation organized under the laws of the state of Delaware, with its principal place of business located at 7550 Teague Road, Suite 300, Hanover, Maryland 21076 and is therefore a citizen of the states of Delaware and Maryland.

10. Terry is an individual residing and domiciled at 615 Trotter Way, Canton, Georgia 30115 and is therefore a citizen of the state of Georgia.

11. This Court has personal jurisdiction over Terry because he performs work within the state of Maryland, regularly does or solicits business in Maryland, entered into the contract at issue in this matter under Maryland law, and engaged in the unlawful conduct in Maryland which has caused harm to Keller in Maryland.

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship of the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to Keller's causes of action occurred in substantial part in this District.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

### KELLER'S BUSINESS OPERATIONS

14. Keller is a geotechnical specialist contractor that provides solutions to geotechnical challenges throughout the construction industry, including across commercial, institutional, mining, infrastructure, and other markets.

15. Among other areas, Keller operates in the deep foundation construction, earth retention, and ground improvement spaces providing its design-build services, products, and solutions to customers across the country and worldwide.

16. Keller's deep foundation services, which are required whenever weak soils have little capacity to resist an existing load or a change in an existing load and involve the construction of structural elements to transfer loads down to stronger underlying soils or rock, include (among other techniques) auger cast piles, bored piles/drilled shafts, driven cast in-situ piles, driven precast piles, screw piles, macropiles, and micropiles.

17. Keller's earth retention services, which are used to retain earth successfully so that it does not move or shift to any unwanted directions, include (among other techniques) anchors, contiguous pile walls, micropile slide stabilization systems, secant pile walls, and sheet piles.

18. Keller also provides ground improvement services, which can increase the load bearing capacity of the ground, reduce settlement, and improve the engineering properties of existing soils through, among other techniques, rigid inclusions, compaction grouting, pressure grouting, and deep soil mixing.

19. Among other locations, Keller has operations in Alabama, Georgia, Florida, Tennessee, and Maryland.

20. Keller has expended significant time, effort, and money to develop its relationships with its customers, to learn their particular business needs, specifications, and requirements; to develop substantial contacts and goodwill with its customers; and to market and sell its products and services to those customers.

21. In addition, to stay competitive, Keller has made a substantial investment in time, effort, and money to develop its confidential and proprietary information, including the names and key contact information of its customers, pricing and usage information, business plans, sales and statistical data, product plans, employee information, and the like.

22. Any misuse of this information would place Keller at a significant competitive disadvantage in the market.

23. Accordingly, Keller has gone to great lengths to maintain the secrecy of its confidential and proprietary information, including but not limited to: (1) restricting access to such information only to certain employees; (2) requiring employees to enter into restrictive covenant agreements; (3) maintaining robust security policies and protocols; and (4) requiring employees to return all information and equipment to Keller upon termination of their employment.

### TERRY'S EMPLOYMENT WITH KELLER

24. Terry was hired by Keller in or around June 1991.

25. Terry was promoted into progressively higher positions with Keller, ultimately being named as Senior Vice President.

26. During his employment with Keller, Terry was responsible for overseeing the operations in Keller's Southeast Region, which encompassed – among other states – Alabama, Georgia, Florida, Tennessee, and Maryland.

27. As a Senior Vice President, Terry also was responsible for and involved in Keller's operations and leadership on a national level, including working with senior leaders on the company's overall operations, leadership, safety, and management; working with senior leaders to formulate strategic initiatives to ensure growth and profit for stake holders; and maintaining trusted relationships with employees and customers.

28. In addition, throughout his employment, Terry had responsibility for, among other things, developing business strategies and plans; identifying new opportunities, markets, clients and technologies while building client relationships; evaluating opportunities to maximize profitability; estimating; engineering; technical writing; negotiating contracts; conducting site

visits and interfacing directly with clients; developing plans and strategies with project teams; improving productivity; monitoring and approving weekly and monthly project and branch financial reports, forecasts, budgets, and other metrics; and building and leading the Southeast Region.

29. While employed by Keller, Terry was introduced to Keller's clients and key client contacts.

30. Terry benefitted directly from the goodwill, reputation, and name recognition generated by Keller's efforts over the years to develop its business.

## TERRY AGREES TO RESTRICTIVE COVENANTS

31. On or about July 1, 2023, Terry's employment with Keller was terminated.

32. In connection with the end of his employment, Terry entered into a separation agreement with Keller ("Agreement"). A true and accurate copy of the Agreement is attached hereto and incorporated herein as **Exhibit 1**.

33. The Agreement contains covenants relating to non-competition, non-solicitation of customers, and non-solicitation of employees, providing, in relevant part:

> Mr. Terry shall refrain from the following activities during the Restricted Period: (1) within the Restricted Area, directly or indirectly becoming employed by or performing services as an independent contractor, consultant, agent, partner, joint venturer, shareholder, or otherwise for any company, entity, or person that engages in the Business; (2) soliciting or diverting or attempting to solicit or divert the business of any entity or person who is a current, former, or potential customer, supplier, or referral source of Keller and; (3) soliciting or attempting to solicit (to become hired by or perform services for Mr. Terry or any entity or company) from Keller or agent of Keller, or who served in such capacity at any time within the six-month period prior to such termination.

Ex. 1, ¶4.d.

34. The "Restricted Period" is defined within the Agreement as "the period of time beginning with the Effective Date [April 15, 2023] and ending on July 1, 2024." Ex. 1, ¶4.b.

35. The "Restricted Area" is defined within the Agreement as the "entire United States." Ex. 1, ¶4.c.

36. The Agreement also contains a provision restricting the use and disclosure of Keller's Confidential Information:

> Mr. Terry agrees to hold all Confidential Information of Keller in confidence as the sole property of Keller, for two years following the Termination Date. Mr. Terry will not use or disclose the same or any part thereof directly or indirectly to any person, firm, or corporation, without the written consent of Keller except in connection with a legal proceeding. "***Confidential Information***" shall mean publicly unavailable information concerning the Business or the business of Keller, including but not limited to, all inventions, secrets, mailing lists, customer and vendor lists and requirements, data regarding referral sources, operating procedures and results, marketing and business plans, marketing research, data relating to product reliability, specifications or performance, systems, techniques, price lists and pricing information, knowhow or financial and statistical data relating to Keller's business.

Ex. 1, ¶5.

37. The Agreement includes a Maryland choice of law provision, which provides: "[t]his Agreement shall be governed and conformed in accordance with the law of Maryland without regarding to its conflict of laws provision." Ex. 1, ¶9.

38. In consideration for his agreement to these restrictive covenants, Terry received a substantial severance payment totaling over $▮▮▮▮▮▮, a vehicle allowance, bonus payment, and certain deferred compensation and Conditional Share Award benefits to which he would not have otherwise been entitled. Ex. 1, ¶3.

**COMPETING COMPANY BERKEL'S BUSINESS OPERATIONS**

39. Berkel is a specialty geotechnical contractor in the deep foundation construction, earth retention, and ground improvement arenas that provides geotechnical construction and specialized foundation and construction services to its clients across the country and in the Caribbean.

40. The company touts itself as being "one of the largest piling contractors in the U.S." and as "the most experienced designer and installer of single-pass, cast-in-place foundation systems in the U.S."

41. According to Berkel's website, the company provides deep foundation work, including auger pressure grouted piles, infinity group piles, drilled displacement/screw piles, limited/remote access, micropiles, energy piles, drilled shafts, driven piles, and rock anchors/tie-downs.

42. According to Berkel's website, Berkel also provides sheeting and shoring, including sheet piles, soldier piles, tie-backs, underpinning, bracing, secant and tangent walls, soil nails, and façade retention, as well as ground improvement work, such as rigid inclusions, compaction grouting, pressure grouting, and deep soil mixing.

43. Berkel's engineering group, which includes structural and geotechnical engineers, offers design assistance, as well as full designs on the company's products and services.

44. Berkel operates and/or maintains projects in locations nationwide.

45. Berkel provides services equivalent or similar to those that Keller provides and is a direct competitor of Keller.

**TERRY'S POST-EMPLOYMENT ACTIVITIES**

46. In or around July 2024, Keller learned that Terry had accepted a job as Executive Vice President with Berkel.

47. Keller subsequently learned that during the Restricted Period under his Agreement, Terry solicited or attempted to solicit (to become hired by or perform services for Mr. Terry or Berkel) from Keller or agent of Keller, or who served in such capacity at any time within the six-month period prior to such termination.

48. Terry's solicitation efforts include, among other things, calling or otherwise talking with multiple Keller employees and asking them to leave to work for Berkel, and upon information and belief, in person lunch and dinner meetings to solicit or attempt to solicit Keller employees to work for Berkel.

49. Between April 15, 2023, and July 1, 2024, Terry called, at a minimum, the following individuals: Joseph Mann, Frank Fonseca, Jordan Moi, Justin McLaughlin, Matthew Hammett, Bob Scott, Daniel Holley, James Bass, Joe Perscichetti, Ryan Smith, and James Dickinson.

50. Of these employees, *half* of them – Joseph Mann, Frank Fonseca, Jordan Moi, Justin McLaughlin, Matthew Hammett, and Bob Scott – have recently resigned their employment with Keller and accepted positions with Berkel.

51. Each of these defecting employees was a member of Terry's business unit in Keller's Southeast Region, and each reported to or otherwise worked with Terry during his time as Keller's Senior Vice President.

52. Notably, this included Maryland-based employee Joseph Mann, who served as Keller's Branch Manager based out of Odenton, Maryland, and who was responsible for, among

other things, expanding and growing markets through business development and proposal preparation; leading the branch team in accordance with the business strategies and plans; developing accurate market knowledge for future development strategy for the branch; managing the strategy for closing proposals, analyzing risks, and setting pricing; developing relationships with customer decision makers; driving strategy to maximize profits; monitoring and approving weekly and monthly project and branch financial reports, forecasts, budgets, and other metrics; and building and leading project-based teams.

53. Upon information and belief, since leaving Keller to join Berkel, Terry has called upon, solicited, or provided Keller clients or customers, or prospective clients or customers, with products or services that compete with the products or services offered by Keller, including customers and prospective customers with whom he dealt or whose identity he learned while employed by Keller.

54. Upon information and belief, Terry was offered, accepted employment with, and started working for Berkel before the Restriction Period under his Agreement expired.

55. Upon information and belief, Terry is using and/or disclosing Keller's confidential and proprietary information to unfairly assist Berkel in developing and growing its market presence in direct competition with Keller.

**TERRY'S INTERFERENCE IN KELLER'S CONTRACTS**

56. At least four of the former Keller employees who Terry solicited prior to his departure from Keller – Joseph Mann, Jordan Moi, Justin McLaughlin, and Matthew Hammett – had contracts with Keller that included various restrictive covenants, including non-compete provisions.

57. As the Senior Vice President overseeing these individuals, Terry was aware of these contracts.

**Joseph Mann**

58. On or about August 27, 2020, in consideration of a promotion, his continued employment, the provision of Confidential Information to him, and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Joseph Mann entered into an Agreement with Keller (the "Mann Agreement"). A true and accurate copy of the Mann Agreement is attached hereto and incorporated herein as **Exhibit 2**.

59. The Mann Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf of any company that is involved in the provision of services equivalent or similar to Geotechnical Construction services, which includes Geotechnical Construction services using Ground Improvement and/or Earth Retention techniques utilizes by Keller, within the State of Maryland and/or within a 50-mile radius of the District of Columbia. . . .

Ex. 2, Mann Agreement, p. 1, ¶A.b.

60. Mann was promoted into progressively higher positions with Keller, ultimately being named as Branch Manager based out of Odenton, Maryland.

61. During his employment with Keller, Mann had responsibility for, among other things, expanding and growing markets through business development and proposal preparation; leading the branch team in accordance with the business strategies and plans; developing accurate market knowledge for future development strategy for the branch; managing the strategy for closing proposals, analyzing risks, and setting pricing; developing relationships with customer decision makers;  driving strategy to maximize profits; monitoring and approving weekly and

monthly project and branch financial reports, forecasts, budgets, and other metrics; and building and leading -project-based teams.

62. On or about August 29, 2024, Mann resigned his position with Keller and accepted a position as with Berkel, working within the State of Maryland and/or within a 50-mile radius of the District of Columbia.

*Justin McLaughlin*

63. On or about October 22, 2018, in consideration of a promotion, his continued employment, the provision of Confidential Information to him, and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Justin McLaughlin entered into an Agreement with Keller (the "McLaughlin Agreement"). A true and accurate copy of the McLaughlin Agreement is attached hereto and incorporated herein as **Exhibit 3**.

64. The McLaughlin Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf of any company that is involved in the provision of services equivalent or similar to Geotechnical Construction using *Dry Soil Mixing, Vibro Replacement, Vibro Compaction, Jet Grouting, Deep Soi Mixing, Mass Mixing, Rigid Inclusions, Micro Piles, Earth Retention* techniques within the State of Tennessee.

Ex. 3, McLaughlin Agreement, p. 2, ¶A.b.

65. McLaughlin was promoted into progressively higher positions with Keller, ultimately being named as an Engineering Manager based out of Nashville, Tennessee.

66. During his employment with Keller, McLaughlin had responsibility for, among other things, in-house design, review, and coordination of engineering projects; interacting with

clients; overseeing quality control; and managing projects, including estimating, revenue and cost reporting, project budgets, client relations, and project team management.

67. On or about September 17, 2024, McLaughlin resigned his position with Keller and accepted a position with Berkel, working from the Nashville, Tennessee area.

***Jordan Moi***

68. On or about December 7, 2016, as a term and condition of his employment and in consideration of the provision of Confidential Information to him and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Jordan Moi entered into an Agreement with Keller (the "Moi Agreement"). A true and accurate copy of the Moi Agreement is attached hereto and incorporated herein as **Exhibit 4**.

69. The Moi Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf any company that is involved in the provision of services equivalent or similar to *Geotechnical Construction* using *including Vibro Replacement, Vibro Compaction, Aggregate Piers, Soil Mixing, Micropiles, Soil Nail or Anchors techniques* within the State of Tennessee. . . .

Ex. 4, Moi Agreement, p. 2, ¶A.b.

70. On December 21, 2020, in connection with a promotion to Senior Project Manager, Moi reaffirmed the non-solicitation, non-competition, and confidentiality obligations set forth in the Moi Agreement. **Exhibit 5**, Moi Promotion Agreement.

71. Moi was promoted into progressively higher positions with Keller, ultimately being named as a Project Executive based out of Nashville, Tennessee.

72. During his employment with Keller, Moi had responsibility for, among other things, developing client relationships; managing strategy for closing proposals, analyzing risks,

and setting pricing; developing sales strategies; ensuring project teams are fulfilling their responsibilities for project management through initial planning, risk management, project execution, change management, and financial management; and developing and driving strategy for successful project execution and maximizing profitability; monitoring and managing weekly and monthly project financial reports, forecasts, budgets, and other metrics; and building and leading - project-based teams.

73. On or about September 23, 2024, Jordan Moi resigned his position with Keller and accepted a position with Berkel, working from the Nashville, Tennessee area.

*Matthew Hammett*

74. On or about November 27, 2017, in consideration of a promotion, his continued employment, the provision of Confidential Information to him, and the Company's investment of time, effort, and money in building relationships with customers, referral sources, and suppliers, Matthew Hammett entered into an Agreement with Keller (the "Hammett Agreement"). A true and accurate copy of the Hammett Agreement is attached hereto and incorporated herein as **Exhibit 6**.

75. The Hammett Agreement contains a non-competition covenant, providing, in relevant part, that for a one-year period after his separation from Keller:

> You will refrain from employment on behalf of any company that is involved in the provision of services equivalent or similar to Geotechnical Construction using *Dry Soil Mixing, Vibro Replacement, Vibro Compaction, Vibro Piers, Rigid Inclusions, Driven Piles, Helical Piles, Jacks Piers, Macropiles, Micropiles, Pit Underpinning, Anchors, Sheet Piles, Soil Nailing, Soldier Piers and Lagging techniques* within the State of Tennessee. . . .

Ex. 6, Hammett Agreement, p. 2, ¶A.b.

76. Hammett was promoted into progressively higher positions with Keller, ultimately being named as Business Development Executive based out of Knoxville, Tennessee.

77. During his employment with Keller, Hammett had responsibility for, among other things, developing client relationships; managing strategy for closing proposals, analyzing risks, and setting pricing; developing sales strategies; estimating and proposal preparation, ensuring project teams are fulfilling their responsibilities for project management through initial planning, risk management, project execution, change management, and financial management; and developing and driving strategy for successful project execution and maximizing profitability.

78. In or around August 16, 2024, Hammett resigned his position with Keller and accepted a position as the Preconstruction Director – Ground Improvement with Berkel, working from the Knoxville, Tennessee area.

## COUNT I
## Breach of Contract

79. Keller repeats and incorporates by reference each of the allegations set forth in the prior paragraphs as if fully set forth herein.

80. The Agreement is a valid and enforceable contract.

81. Terry received adequate consideration for the Agreement and the restrictive covenants contained therein, including a payment totaling over $_____, a vehicle allowance, bonus payment, and certain deferred compensation and Conditional Share Award benefits to which he would not have otherwise been entitled.

82. Keller has fully performed its obligations under the Agreement.

83. By soliciting and/or recruiting current Keller employees to leave their employment with Keller and defect to Berkel, Terry has breached the Agreement.

84. By, upon information and belief, accepting employment with Berkel before the Restriction Period under his Agreement expired, Terry has breached the Agreement.

85. As a direct and proximate result of Terry's actions in breach of the Agreement, Keller has and will sustain damages.

86. Although the full extent of Terry's actions and the damages caused thereby are presently unknown and irreparable, Terry's breach of the Agreement has caused and will continue to cause damages to Keller, including without limitation: loss of employees, jeopardy to and/or loss of Keller's existing and future business relationships and contacts with its customers, loss of customer confidence, loss of goodwill, loss of confidential business information, loss of referral sources, damage to or loss of Keller's reputation, and loss of competitive advantage, all of which exceeds the monetary value of $75,000, exclusive of interest and costs.

87. Keller is therefore entitled to a judgment against Terry awarding damages in an amount to be determined at trial; granting a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Terry from competing against Keller and soliciting Keller's employees and customers in violation of his Agreement for a period of one year from the date on which injunctive relief is first entered; and awarding such further relief as the Court deems just and proper.

**COUNT II**
**Tortious Interference with Economic Relations**

88. Keller repeats and incorporates by reference each of the allegations set forth in the prior paragraphs as if fully set forth herein.

89. Keller had business relationships with Joseph Mann, Frank Fonseca, Jordan Moi, Justin McLaughlin, Matthew Hammett, and Bob Scott that, absent Terry's interference, were likely to continue.

90. Terry's interfered with Keller's relationships with Joseph Mann, Frank Fonseca, Jordan Moi, Justin McLaughlin, Matthew Hammett, and Bob Scott through intentional and willful acts by Terry.

91. These solicitations were calculated to cause damage and loss to Keller.

92. These solicitations were done with an unlawful purpose and out of malice.

93. Terry had no justification for his intentional interference with Keller's economic relations with Joseph Mann, Frank Fonseca, Jordan Moi, Justin McLaughlin, Matthew Hammett, and Bob Scott.

94. As a direct and proximate result of the actions of Terry, Keller has sustained damages.

95. The conduct of Terry, as alleged herein, was intentional, malicious, and demonstrates a complete indifference to or a conscious disregard for the rights of Keller.

## COUNT III
## Tortious Interference with Contract

96. Keller repeats and incorporates by reference each of the allegations set forth in the prior paragraphs as if fully set forth herein.

97. The Mann Agreement, McLaughlin Agreement, Moi Agreement, and the Hammett Agreement are valid and enforceable contracts.

98. Terry was aware of the existence of these contracts, as well as the restrictive covenants contained therein.

99. By soliciting and/or encouraging Mann to leave his employment with Keller, Terry intentionally interfered with the contract between Mann and Keller, inducing a breach of the Mann Agreement.

100. By soliciting and/or encouraging McLaughlin to leave his employment with Keller, Terry intentionally interfered with the contract between McLaughlin and Keller, inducing a breach of the McLaughlin Agreement.

101. By soliciting and/or encouraging Moi to leave his employment with Keller, Terry intentionally interfered with the contract between Moi and Keller, inducing a breach of the Moi Agreement.

102. By soliciting and/or encouraging Hammett to leave his employment with Keller, Terry intentionally interfered with the contract between Hammett and Keller, inducing a breach of the Hammett Agreement.

103. Terry had no justification for its intentional interference with the contracts Keller has with Mann, McLaughlin, Moi, and Hammett.

104. As a direct and proximate result of the actions of Terry, Keller has sustained damages.

105. The conduct of Terry, as alleged herein, was intentional, malicious and demonstrates a complete indifference to or a conscious disregard for the rights of Keller.

**REQUEST FOR RELIEF**

WHEREFORE, Keller demands and prays for relief against Michael W. Terry as follows:

(a) a temporary, preliminary, and permanent injunction enjoining Terry from:

 (i) soliciting or attempting to solicit (to become hired by or perform services for Mr. Terry or any entity or company) from Keller or agent of Keller, or who served in such capacity at any time within the six-month period prior to such termination;

 (ii) soliciting or diverting or attempting to solicit or divert the business of any entity or person who is a current, former, or potential customer, supplier, or referral source of Keller; and

        (iii)   directly or indirectly disclosing or using confidential, proprietary, trade secret information belonging to Keller.

(b)    that Keller be relieved of any obligation to post an injunction bond;

(c)    actual, compensatory and punitive damages in an amount to be proven at trial;

(d)    an award of reasonable attorneys' fees and costs incurred in this action;

(e)    pre- and post-judgment interest at the maximum rate permitted by law; and

(f)    such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ *Eleanor F. Miller*
Eleanor Miller (No. 30925)
Jason Roberts (*pro hac vice forthcoming*)
**FISHER & PHILLIPS, LLP**
1401 New York Avenue, N.W., Suite 400
Washington, D.C.
Phone: 202.916.7189
Facsimile: 202.978.3788

ATTORNEYS FOR PLAINTIFF

## VERIFICATION

I declare and verify under penalty of perjury under the laws of the United States of America and the State of MO that the foregoing is true and correct.

Executed on: 10/23/24

By: Curtis Cook

Title: Executive Vice President